IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SUSAN SNYDER,                    )
                                 )
                Plaintiff,       )
                                 )
        v.                       )    Case No. 11-0631-CV-W-REL-SSA
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
                Defendant.       )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Susan Snyder seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the administrative law judge (ALJ) erred by assigning some weight to the opinion of a non-medical state agency single decision maker, by failing to properly weigh the medical opinions in the record, and by failing to derive a proper residual functional capacity. I find that the ALJ did not err as alleged. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### I. BACKGROUND

On February 15, 2008, plaintiff applied for disability benefits alleging that she had been disabled since January 29, 2007. Plaintiff's disability stems from injuries sustained to her shoulders. Plaintiff's application was denied on April 9, 2008. On February 22, 2010, a hearing was held before Administrative

Law Judge (ALJ) William Horne. On April 5, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On May 19, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

2

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed

3

regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Waddell, in addition to documentary

4

evidence admitted at the hearing.

**A.** ***ADMINISTRATIVE REPORTS***

The record contains the following administrative reports.

1. **Plaintiff's earnings statement**

Plaintiff's earnings statement shows the following income for the years indicated (Tr. 171).

| | |
|------|------|
| 1970 | $236.50 |
| 1971 | $184.88 |
| 1972 | $189.68 |
| 1973 | $593.80 |
| 1974 | $779.71 |
| 1975 | $515.10 |
| 1976 | $653.30 |
| 1977 | None |
| 1978 | $2,159.56 |
| 1979 | $5,115.16 |
| 1980 | $3,095.50 |
| 1981 | $1,394.41 |
| 1982 | $7,197.08 |
| 1983 | $7,443.93 |
| 1984 | $4,010.57 |
| 1985 | $2,295.32 |
| 1986 | $7,700.73 |
| 1987 | $12,646.41 |
| 1988 | $13,341.63 |
| 1989 | $15,427.28 |
| 1990 | $17,302.87 |
| 1991 | $6,372.74 |
| 1992 | $1,969.85 |
| 1993 | $897.50 |
| 1994 | $40.00 |
| 1995 | $590.25 |
| 1996 | None |
| 1997 | $6,109.70 |
| 1998 | $10,430.71 |
| 1999 | $12,505.42 |
| 2000 | $16,366.61 |
| 2001 | $17,214.02 |
| 2002 | $18,021.21 |
| 2003 | $15,727.66 |
| 2004 | $16,803.67 |
| 2005 | $15,360.10 |

Case 4:11-cv-00631-REL   Document 13   Filed 09/25/12   Page 5 of 50

```
2006      $16,780.13
2007      $5,988.14
```

## 2. Application summary for supplemental security income

On February 15, 2008, plaintiff completed an application for supplemental security income. In her application, plaintiff represented that her disability began on January 29, 2007; she has been married twice; and she was then living and purchasing a home in Kansas City, Missouri with her minor child (Tr. 145-150).

## 3. Application summary for disability insurance benefits

On February 15, 2008, plaintiff completed an application for disability insurance benefits. In her application, plaintiff represented the same information contained in her application for supplemental security income with the addition of the representation that she had received workers' compensation in the past, such compensation ending on October 24, 2007 (Tr. 151-155).

## 4. Disability report - field office

On February 19, 2008, plaintiff was interviewed by V. Price concerning her disability application (Tr. 183-186). Plaintiff listed her alleged onset date as January 29, 2007 (Tr. 183). The interviewer noted that while plaintiff alleged an onset date of January 29, 2007, that plaintiff returned to work for a period after her injury (Tr. 184). During that time, plaintiff worked two to three days a week and was off for a period due to surgery (Tr. 184). The interviewer also noted that the Claims Representative was recommending an unsuccessful work attempt from

6

January 29, 2007 through September 22, 2007 (Tr. 184).

## 5. Disability report - adult

In an undated disability report (Tr. 203-210), plaintiff listed her height as 5'3" and her weight as 240 pounds (Tr. 203). Plaintiff said that she was unable to work due to injury to her right and left shoulders, diabetes, and back problems (Tr. 204). Plaintiff indicated that these illnesses and injuries caused her to be in pain and tired all the time (Tr. 204). Plaintiff said that her injury occurred on January 29, 2007, and that due to her injury she stopped working on September 22, 2007 (Tr. 204). Concerning her employment history, plaintiff stated that she had held several jobs over the previous 15 years, the last of which ended on September 22, 2007 (Tr. 204-206). When asked why she stopped working, plaintiff's response was "because of my injury" (Tr. 204). Plaintiff said that her longest employment was as a house parent, which lasted from 1997-2005 (Tr. 205). Plaintiff listed her medications and the conditions for which they were prescribed as (Tr. 208):

```
Darvocet      Pain
Flexeril      Pain
```

Plaintiff reported having an education consisting of two years of college, which she completed in 1988 (Tr. 209).

## 6. Disability report - appeal

On June 6, 2008, plaintiff indicated that she had new conditions that began after her disability report of February 15,

7

2008 (Tr. 232). She listed her new conditions as arthritis and asthma and listed a beginning date for these conditions as April of 2008 (Tr. 232). Plaintiff noted that she was still on the same medications as listed previously, but that she was "in pain alot (sic) because I can't afford my medications" (Tr. 235).

### 7. Claimant's recent medical treatment

In an undated report (Tr. 241-243), plaintiff listed new conditions of rheumatoid arthritis and asthma allegedly diagnosed in March of 2008 (Tr. 241). She also listed prescription medications that were not previously listed and the conditions for which they were prescribed as (Tr. 242):

| | |
|---|---|
| Ultram/Tramadol | Pain |
| Glyburide | Diabetes |
| Metformin | Diabetes |
| Triamcinolone Cream | Irritation |

Plaintiff also noted that in addition to the prescriptions listed above, she also frequently took Tylenol (sometimes prescription-strength Bufferin), Benadryl, Aleve, and Tylenol P.M., as well as using Hydrocodone or Gold Bond cream or medicated spray (Tr. 242).

### 8. Physical Residual Functional Capacity Assessment

On April 9, 2008, Kim Yocom, a disability medical examiner, completed a physical residual functional capacity assessment on plaintiff based on available medical records (Tr. 222-227). The assessment concluded that plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk for six hours in

8

an eight-hour day; sit for six hours in an eight-hour day and was limited in her upper extremities with regards to push/pull (Tr. 223). The assessment stated that plaintiff should not push/pull on a frequent basis and is restricted to less than 20 pounds (Tr. 223). The assessment also stated that plaintiff should only occasionally climb, stoop, kneel, crouch or crawl and that she should never balance (Tr. 225). In addition, plaintiff was limited in reaching all directions (Tr. 225). Concerning environmental limitations, the assessment indicated that plaintiff should avoid all exposure to extreme cold, extreme heat, and vibration (Tr. 226). The assessment stated that while plaintiff's "symptoms of shoulder pain are credible based on her injuries" that she had a normal physical exam for back and lower extremities despite alleged pain (Tr. 227).

## B.  *SUMMARY OF MEDICAL RECORDS*

On June 13, 1998, plaintiff had an x-ray of her lumbar spine at Trinity Hospital which revealed diffuse moderate lumbar spondylosis (Tr. 473).

On June 23, 1998, plaintiff again went to Trinity Hospital reporting back pain radiating down her right leg and was examined by Aaron L. Peimann, M.D. Plaintiff had significant pain with more pain radiating down the back of her right leg as well as some numbness in her toes occasionally. She reported limping when she walked. Examination revealed normal deep tendon reflexes,

Case 4:11-cv-00631-REL   Document 13   Filed 09/25/12   Page 9 of 50

decreased muscle strength tested by foot flexion, and positive straight leg raise. Dr. Peimann assessed her with right leg pain and ordered an electromyography test (EMG) because he was concerned that she may have had sciatic nerve impingement (Tr. 465).

On June 25, 1998, plaintiff returned to Trinity Hospital and the EMG showed evidence of acute L5 radiculopathy[1] (Tr. 475).

On January 31, 2006, plaintiff reported to Trinity Hospital for an x-ray of her cervical spine. The x-ray demonstrated marked degenerative changes at C4-5 through C6-7 with mild encroachment of neural foramina bilaterally at C4-5 and C5-6 secondary to osteophytic spurring[2] (Tr. 470).

On January 18, 2007, plaintiff reported to Goppert Trinity Family Care (Goppert) for evaluation of diabetes by Dr. A.J. Delaney, M.D. At that time she was not taking Metformin[3], watching her diet, or checking her blood sugars. Dr. Delaney diagnosed her with diabetes - mellitus type II - uncontrolled and noted her weight at 215 pounds (Tr. 388; 394).

On January 29, 2007, plaintiff went to Goppert reporting left shoulder pain after she fell on the ice earlier that morning

---

[1]Radiculopathy refers to a set of conditions when one or more nerves do not work properly.

[2]Osteophytic spurs, commonly called bone spurs, are bony outgrowths that develop in or near joints and connective tissue.

[3]Metformin is used to treat type 2 diabetes.

10

(Tr. 386). X-rays of her left shoulder showed no evidence of fracture or dislocation (Tr. at 392, 468). Hong Nguyen, M.D., examined plaintiff and assessed her with shoulder pain likely due to a contusion. Dr. Nguyen immobilized her shoulder for comfort and prescribed Naproxen and Vicodin for pain relief (Tr. 386-87).

On February 1, 2007, plaintiff returned to Goppert for evaluation of her diabetes by Dr. Delaney. She reported feeling much better with her blood sugar under control. Dr. Delaney assessed her with uncomplicated diabetes and noted her weight was 222 pounds (Tr. 385, 394).

On February 5, 2007, plaintiff returned to Goppert and was examined by Dr. Nguyen in follow up for her left shoulder injury. She reported that she was doing much better, but had been unable to return to work since the injury due to her pain. Upon examination, Dr. Nguyen noted that plaintiff exhibited normal range of motion in her left shoulder but had discomfort with abduction. Plaintiff's right shoulder also exhibited normal range of motion. Dr. Nguyen referred her to physical therapy and advised her to take Naproxen[4] prior to physical therapy sessions. Dr. Nguyen also prescribed Vicodin[5] as needed for pain (Tr. 384).

On February 12, 2007, plaintiff reported to Concentra for an initial evaluation by Judith Tharp, M.D., prior to beginning

---

[4]Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by arthritis.

[5]Vicodin is used to treat moderate to severe pain.

Case 4:11-cv-00631-REL   Document 13   Filed 09/25/12   Page 11 of 50

physical therapy. Plaintiff had full range of motion in her neck, but exhibited a very tight left trapezius muscle (Tr. 359). Her left shoulder was tender to manipulation in most directions, with the most trouble abducting and flexing in the arc between 90 and 110 (Tr. 359). Plaintiff was able to reach her right shoulder with her left hand, but the last few inches were very painful (Tr. 359). X-rays demonstrated degenerative disc disease of her cervical spine, but the left shoulder was negative (Tr. 359). Dr. Tharp diagnosed a left shoulder strain with possible rotator cuff strain, as well as degenerative joint and disc disease of the cervical spine (Tr. at 360). Dr. Tharp recommended work restrictions to include no reaching above shoulders and limited use of her left arm (Tr. 360). She also recommended physical therapy two to three times per week for one to two weeks. Dr. Tharp prescribed Naproxen 550 mg every twelve hours, Cyclobenzaprine[6] 10 mg daily and Hydrocodone[7] 5/500 mg (Tr. 360).

On February 14, 2007, plaintiff returned to Concentra for her initial physical therapy session with Eugene L. DesCoteaux, PT. Plaintiff reported left anterior shoulder pain and right upper arm, bicep pain exacerbated by any shoulder movement, reaching behind her back and reaching overhead (Tr. 250). All tests were within normal limits (Tr. 251). DesCoteaux assessed

---

[6]Cyclobenzaprine is a muscle relaxer.

[7]Hydrocodone is used to treat moderate to severe pain.

her with left supraspinatus strain and right biceps strain (Tr. 252). DesCoteaux noted that plaintiff's impairments prevented her from performing standard activities of daily living and work (Tr. 252). DesCoteaux noted that plaintiff's physical therapy goals included returning to work, increasing range of motion and strength in her shoulders, and pain reduction (Tr. at 252). He recommended nine to twelve physical therapy visits and gave her instructions for home exercise (Tr. 252-53).

On February 19, 2007, plaintiff went to Craig Lofgreen, M.D., at Concentra (Tr. 362). Plaintiff explained that she had returned to regular duty work, and felt less shoulder pain, although her right biceps hurt (Tr. 362). Dr. Lofgreen found that Plaintiff had decreased range of motion in her left shoulder, and was tender to touch in her shoulder and right biceps (Tr. 362). Dr. Lofgreen diagnosed shoulder impingement and shoulder strain, and instructed plaintiff to avoid repetitive use of her right arm (Tr. 362).

On February 21, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff reported that her left shoulder and right upper arm were feeling better. She also indicated that Stone Manufacturing had changed her work activity and that she was still working (Tr. 261).

On February 23, 2007, plaintiff saw Sima Rad, M.D., at Concentra (Tr. at 363). Dr. Rad observed that plaintiff had

13

limited range of motion in her shoulders (Tr. at 363). He restricted plaintiff to limited use of her right arm and shoulder (Tr. at 363).

On February 23, 2007, plaintiff also had a physical therapy session with DesCoteaux. Plaintiff was working with modified activity and feeling better. She reported pain in her left shoulder and right upper arm the previous night. DesCoteaux noted that plaintiff gave good effort throughout her therapy sessions. He opined that she may have a partial tear of the supraspinatus (Tr. 258-60).

On February 28, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff reported that she was continuing to work an 8-hour day (Tr. 282).

On March 2, 2007, plaintiff returned to Dr. Lofgreen at Concentra (Tr. at 365). She reported that her right shoulder felt better although her left shoulder was painful (Tr. at 365). Dr. Lofgreen found that plaintiff had normal shoulder range of motion, no tenderness to palpation, and normal sensory function in her upper extremities (Tr. at 365). He diagnosed shoulder impingement, and instructed plaintiff not to lift more than fifteen pounds with her left arm (Tr. at 365).

On March 6, 2007, plaintiff saw Dr. Lofgreen again at Concentra (Tr. at 366). Plaintiff denied any improvement (Tr. at 366). Dr. Lofgreen diagnosed a complete rupture of the rotator

14

cuff (Tr. at 366). He ordered a magnetic resonance imaging (MRI) scan, and prescribed Ultram (Tr. at 366).

On March 6, 2007, plaintiff also had her ninth physical therapy session with DesCoteaux and had not missed a session. DesCoteaux noted that plaintiff exhibited left shoulder impingement signs (Tr. 275-78).

On March 22, 2007, plaintiff returned to Goppert for follow up evaluation of her diabetes by Dr. Delaney. Dr. Delaney noted that she started two new oral medications at her last visit and her blood sugars were doing much better. (Tr. 383). Plaintiff weighed 235 pounds. (Tr. 393). Dr. Delaney assessed diabetes without complications (Tr. at 383). Dr. Delaney prescribed Vicodin 5/500 one to two doses every four to six hours as needed for shoulder pain. (Tr. 383).

On April 16, 2007, plaintiff returned to Goppert to follow up with Dr. Delaney on her diabetes and shoulder pain. She noted her blood sugar was improved and she felt much better. Her blood sugar was 231[8] and Dr. Delaney noted that she weighed 245 pounds. (Tr. 382, 393).

On April 2, 2007, plaintiff reported to Dickson-Diveley Midwest Orthopaedics reporting bilateral shoulder pain, left worse than right, and was examined by Lowry Jones, M.D. She was

---

[8]Normal blood-sugar levels are 70 - 130 mg/dL before meals or upon waking, and less than 180 mg/dL two hours after the start of a meal.

referred by workers' compensation. Dr. Jones noted that plaintiff's range of motion improved with physical therapy, but her pain persisted. Plaintiff reported her pain was worse at night and with any overhead activity. She also had pain in her right shoulder, especially with cross-body adduction.[9] Plaintiff was taking Hyrdocodone at night to help her sleep and Naproxen on an intermittent basis. Plaintiff denied numbness, tingling or reproduction of shoulder pain with cervical spine range of motion. Dr. Jones noted positive impingement signs and significant pain with palpation of the distal acromion of the left shoulder. Dr. Jones assessed her with left shoulder probable partial rotator cuff tear, right shoulder pain and right shoulder impingement syndrome. Dr. Jones recommended a MRI of her left shoulder and a subacromial cortisone injection of her right shoulder. Additionally, he placed work restrictions on plaintiff such that she could return to light duty, but avoid repetitive lifting overhead with both arms and never lifting more than ten pounds with both arms to her chest (Tr. 425-26).

On April 10, 2007, plaintiff returned to Dickson-Diveley for follow up of bilateral shoulder pain with Dr. Jones. Dr. Jones reviewed a MRI of her left shoulder which revealed a high-grade partial tear of the supraspinatus, definite impingement findings and a lot of edema in the rotator cuff (Tr. 423). Dr. Jones

---

[9]Cross-body adduction is stretch for posterior shoulder mobility (shoulder stretch).

opined that the findings in the right shoulder would be very similar. Dr. Jones recommended arthroscopic evaluation and likely rotator cuff repair of the left shoulder first because it was worse than the right. Additionally, he restricted plaintiff to no repetitive reaching, pushing, pulling, etc. with either arm, and she should keep all work below shoulder and chest level (Tr. 423-24). Dr. Jones scheduled plaintiff for left shoulder surgery.

On April 16, 2007, plaintiff returned to Goppert to be examined by Dr. Delaney for shoulder pain. Dr. Delaney noted that examination revealed normal range of motion but there was discomfort with abduction and weakened rotator cuff muscles. He assessed plaintiff with osteoarthritis of the shoulder and recommended she proceed with surgery (Tr. 382).

On April 30, 2007, plaintiff returned to Goppert for follow up of shoulder pain with Dr. Delaney. Dr. Delaney noted that her pain was well controlled, but she was missing several days of work due to an inability to use pain medications at work (Tr. 393). Plaintiff also claimed that her blood-sugar level had improved (Tr. at 381).

On May 4, 2007, plaintiff went to Dickson-Diveley for left shoulder surgery with Dr. Jones. Dr. Jones noted that a pre-operative diagnosis of left shoulder high-grade partial rotator cuff tear. Dr. Jones performed left shoulder arthroscopy with debridement of torn anterior labrum, debridement of internal

17

portion of rotator cuff, followed by external decompression (acromioplasty) and arthroscopic rotator cuff repair. Post-operatively, Dr. Jones assessed plaintiff with anterior tear of the anterosuperior labrum, high grade 90 percent tear of the supraspinatus and chronic impingement (Tr. 419-20).

On May 14, 2007, plaintiff returned to Dickson-Diveley for follow up of her left shoulder surgery by Dr. Jones. Dr. Jones noted that she was clinically doing fine and her incisions looked fine with minimal erythema. Plaintiff was controlling her pain with Darvocet. Dr. Jones instructed plaintiff to start pendulum and pulley exercises, but to limit her left shoulder to passive range of motion for the next three to four weeks (Tr. 417). Dr. Jones further directed plaintiff to return in four weeks at which point she would begin a formal therapy program. Plaintiff was to have no activity with her left arm including no pushing, pulling, or reaching (Tr. 417). Dr. Jones opined that she would reach maximum medical improvement with her left shoulder in eight to ten weeks (Tr. 417).

On June 11, 2007, plaintiff returned to Dickson-Diveley for follow up of her left shoulder surgery with Dr. Jones. She reported that her shoulder had been out of the sling and she was doing her home pulley exercises (Tr. 415). Plaintiff was doing well during the day, but still having discomfort at night. She was controlling her pain with Darvocet (Tr. 415). Dr. Jones gave

18

her a prescription for physical therapy and returned her to work on light duty with no use of her left arm and no repetitive lifting of her right shoulder (Tr. 415).

On June 13, 2007, plaintiff returned to Concentra to resume physical therapy with DesCoteaux following her left shoulder surgery. DesCoteaux noted that she had a medical diagnosis of anterior labral tear, impingement and supraspinatus tear of the left shoulder (Tr. 270). DesCoteaux recommend therapy one to three times per week for four to six weeks including range of motion, stretching and progressive strengthening exercise to address her decreased range of motion and weakness (Tr. 272). He also performed electrical stimulation (Tr. 273).

On June 21, 2007, plaintiff saw Dr. Delaney again at Goppert (Tr. at 379-80). Plaintiff reported nausea and vomiting following shoulder surgery (Tr. at 379). She also reported "unbearable" right hip pain (Tr. at 379). Plaintiff informed Dr. Delaney that she stopped taking cholesterol medication due to financial constraints, but was using pain medication with good results (Tr. at 379). Dr. Delaney observed that plaintiff was obese (Tr. at 379). X-rays of her right hip showed no fracture or dislocation (Tr. at 391, 467). Dr. Delaney diagnosed right hip pain, gastroesophageal reflux disease, obesity, and diabetes (Tr. at 380). He noted that Plaintiff likely had osteoarthritis, and should continue taking Tylenol as needed (Tr. at 380). He also

19

observed that plaintiff had to lose weight (Tr. at 380).

On June 26, 2007, plaintiff had a physical therapy session with DesCoteaux and stated that she was feeling much improved (Tr. 288). Plaintiff also reported that she felt like she could do more with her shoulder and that her range of motion had improved (Tr. 288).

On July 3, 2007, plaintiff had a physical therapy session with DesCoteaux where she stated that she had been able to walk .75 miles the previous day (Tr. 309).

On July 5, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff stated that she was able to do more with her left arm including washing her hair and sweeping (Tr. 306).

On July 10, 2007, plaintiff had a physical therapy session with DesCoteaux in which she stated that she was able to do more activity at home but that she was worried about her ability to return to work (Tr. 303).

On July 12, 2007, after nineteen physical therapy sessions, DesCoteaux wrote a letter to Dr. Jones. (Tr. 321). DesCoteaux reported that plaintiff continued have pain rated at two out of ten at the anterior and lateral shoulder (Tr. 321). Plaintiff also reported intermittent pain with increased activity at home which decreased with rest. DesCoteaux noted that plaintiff continued to exhibit tenderness to palpation over the anterior

and lateral shoulder (Tr. 321). Plaintiff was able to tolerate 35-45 minutes of endurance, stretching and strengthening. Additionally, DesCoteaux noted that plaintiff had consistently demonstrated good effort in therapy and she was making consistent progress in physical therapy regarding her active range of motion, strength and functional abilities (Tr. 322).

On July 17, 2007, plaintiff returned to Dickson-Diveley for follow up of her bilateral shoulder pain and left shoulder rotator cuff repair with Dr. Jones. Dr. Jones noted that plaintiff had been in physical therapy with improvement to shoulder motion and strength. Plaintiff reported basilar neck and upper back pain as well as right shoulder pain (Tr. 413). Dr. Jones suspected a partial tear in her right shoulder. He recommended a MRI of her right shoulder and to continue physical therapy with a plan to release her in four weeks (Tr. 413). Dr. Jones estimated that she would reach maximum medical improvement for her left shoulder in four weeks, but she may require debridement of her right shoulder (Tr. 413).

On July 20, 2007, plaintiff went to Goppert reporting nausea and vomiting since her surgery on May 4, 2007, and was examined by James Neil, M.D. Plaintiff weighed 254 pounds. (Tr. 393). She stated that she stopped taking her Gluconave, Lovastatin, and Actos due to nausea, feeling generally ill, and an inability to afford her medications. Plaintiff told Dr. Neil that her blood

21

sugars were averaging 200-220, but had been as high as 340. Dr. Neil assessed her with uncontrolled diabetes mellitus type II and restarted her Actos[10], Metformin and Lovastatin[11] (Tr. 378).

On July 23, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff stated that she had returned to work that day and that she was feeling well (Tr. 318).

On July 24, 2007, plaintiff visited Dr. Delaney at the Clay Platte Family Medicine Clinic ("Clay Platte Clinic") (Tr. at 375). Plaintiff wished to establish care as a new patient (Tr. at 375). Dr. Delaney noted that Plaintiff had pain with range of motion in her left and right arms, but retained good sensation (Tr. at 375). Dr. Delaney diagnosed diabetes and left and right shoulder pain (Tr. at 375). He directed Plaintiff to see an orthopedic specialist (Tr. at 375).

On August 1, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff stated that she had been unable to complete a full day of work since her return (Tr. 336).

On August 3, 2007, plaintiff had another physical therapy session with DesCoteaux in which she reported that she had left work early due to soreness in her shoulder (Tr. 333).

On August 8, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff stated that she experienced increased

---

[10]Actos is used to treat diabetes.

[11]Lovastatin is used to treat heart attack and stroke. It is also used to lower cholesterol.

pain while working (Tr. 327).

On August 10, 2007, plaintiff returned to Concentra for her twenty-seventh physical therapy session with DesCoteaux. Plaintiff was feeling better and reported no pain in her right shoulder (Tr. 323). She reported that she was working on modified activity and she was performing her home exercise program twice per day. Palpation elicited mild discomfort in her left shoulder (Tr. 323-25). Additionally, Mr. DesCoteaux wrote Dr. Jones another letter (Tr. at 345-46). He indicated that plaintiff made significant progress, but should continue physical therapy to improve her strength and functional abilities (Tr. at 346).

On August 14, 2007, plaintiff returned to Dickson-Diveley for a recheck of her left shoulder and bilateral shoulder pain with Dr. Jones. Dr. Jones noted that she had progressed nicely since her left shoulder surgery on May 4, 2007. She reported continued pain with overhead activity in her right shoulder. Dr. Jones noted that a MRI of right shoulder in July showed a degenerative cyst at the insertion of the supraspinatus[12], which was consistent with chronic impingement and partial undersurface tear of the supraspinatus (Tr. 410). Dr. Jones stated that her only option would be surgical debridement. Plaintiff reported that her current job seemed more stressful than the job she performed before she received work restrictions (Tr. at 410).

_____

[12]Supraspinatus muscle is a small muscle of the upper arm (rotator cuff).

Case 4:11-cv-00631-REL   Document 13   Filed 09/25/12   Page 23 of 50

Based on this comment, Dr. Jones removed her restrictions (Tr. at 410), but recommended four more weeks of physical therapy to maximize overhead strength in her left shoulder (Tr. 411).

On August 28, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff reported that she was able to work that day without much pain or discomfort in her left shoulder (Tr. 339).

On August 30, 2007, plaintiff had a physical therapy session with DesCoteaux. Plaintiff reported that she was able to work only in the afternoon on that day, and had left work early the previous day (Tr. 347).

On September 10, 2007, DesCoteaux wrote another letter to Dr. Jones after plaintiff's thirty-second physical therapy session. DesCoteaux noted that plaintiff continued to report intermittent pain in her anterior/lateral shoulder and in the right shoulder as well as pain originating from the muscles of her cervical spine (Tr. 353). She had normal joint motion in the cervical spine. Plaintiff also continued to have pain with activity during modified duties at work (Tr. 353). She continued to exhibit mild tenderness to palpation at the left anterior and lateral shoulder. DesCoteaux again noted that plaintiff consistently demonstrated good effort in therapy and she made consistent progress in physical therapy regarding active range of motion, strength and functional abilities. Plaintiff had

24

noticeable improved strength in the rotator cuff on the left shoulder. DesCoteaux recommended discharge because she had met her goals for the left shoulder (Tr. 354).

On September 11, 2007, plaintiff returned to Dickson-Diveley for a bilateral shoulder evaluation by Dr. Jones. Dr. Jones opined that she had reached maximum medical improvement with her left shoulder and he released her to fully return to her job at Stone Manufacturing (Tr. 408). The job required minimal to no lifting, and only required reaching and pulling primarily at or below shoulder level. Dr. Jones further noted that she may require arthroscopic evaluation, debridement and decompression of her right shoulder (Tr. 409).

On September 24, 2007, plaintiff had a MRI of her left shoulder at Clay Platte Family Medicine, which demonstrated thickening of the supraspinatus and infraspinatus tendons with abnormal signal along the articular surfaces more prominently involving the infraspinatus tendon (Tr. 370). The appearance suggested tendinopathy or possibly partial thickness tears. There was no recurrent full-thickness tear of the rotator cuff. The MRI further demonstrated moderate acromioclavicular degenerative changes and mild glenohumeral degenerative changes, moderate joint effusion and fluid in the subdeltoid bursa (Tr. 370).

On September 28, 2007, plaintiff returned to Dickson-Diveley for right shoulder surgery by Dr. Jones. Dr. Jones assessed her

with right shoulder partial rotator cuff tear with impingement prior to the surgery. Dr. Jones performed right shoulder arthroscopy with debridement of SLAP[13] lesion and release of Buford complex[14], debridement of the undersurface of rotator cuff and decompressive acromioplasty. Following the surgery Dr. Jones diagnosed her with a Type I SLAP lesion with associated Buford complex, undersurface partial rotator cuff tear of the subcapularis and supraspinatus. (Tr. 404-05).

On October 3, 2007, plaintiff saw Dr. Delaney again at the Clay Platte Clinic (Tr. at 374). Plaintiff reported high blood sugar (Tr. at 374). Dr. Delaney diagnosed arthritis, uncontrolled diabetes, and left shoulder pain (Tr. at 374). He prescribed therapeutic injections for plaintiff's shoulders, and continued her medications (Tr. at 374). Dr. Delaney also noted that plaintiff should improve her diet and begin insulin therapy (Tr. at 374).

On October 8, 2007, plaintiff returned to Dickson-Diveley for follow up of right shoulder arthroscopy with Dr. Jones. The surgical sites looked fine and she performed good pendulum and pulley exercises. Dr. Jones instructed her to continue those exercises and to return in two weeks when she would begin formal

---

[13]SLAP is an acronym that stands for "superior labral tear from anterior to posterior."

[14]Buford complex is a thickening of the middle glenohumeral ligament with an absence of the anterosuperior labrum complex.

physical therapy. In the meantime, he recommended no pushing, pulling, or lifting and she could only hold objects with her right arm (Tr. 402).

On October 22, 2007, plaintiff returned to Dickson-Diveley for follow up of her shoulder surgery with Dr. Jones. Her pain was controlled with oral medication and she had good passive range of motion in all planes (Tr. 400). She reported continued discomfort with overhead activity. Dr. Jones instructed her to begin formal physical therapy and opined that she would reach maximum medical improvement in six to eight weeks (Tr. 400). He further instructed her to avoid repetitive pushing and pulling above shoulder level on either side (Tr. 400).

On November 19, 2007, plaintiff returned to Dickson-Diveley reporting bilateral shoulder pain to Dr. Jones. Dr. Jones noted that her pain was well controlled with oral medication and clinical examination showed good passive range of motion in all planes (Tr. 398). She did have discomfort with overhead activity. Plaintiff reported that her left shoulder pain was worse than her right. Dr. Jones noted that she had attempted strengthening the right shoulder which had increased her pain. He suggested that she continue physical therapy to maximize her activities of daily living, but did not believe she would be able to significantly improve her strength with overhead activity (Tr. 398). Dr. Jones opined that she would reach maximum medical improvement in three

27

weeks, but in the meantime she was to avoid repetitive pushing and pulling with her arms and lifting more than five pounds (Tr. 399).

On December 28, 2007, plaintiff went to Goppert and was evaluated by Donald Philgreen, M.D., for her diabetes. She reported that she was on Metformin, but was also supposed to be taking Actos, which she was unable to afford. She reported gaining about thirty to forty pounds over the previous year and Dr. Philgreen noted her weight was 254 pounds. Plaintiff also complained of pain in her left knee. Examination revealed tenderness along the medial joint line (MCL) of her left knee without effusion. Dr. Philgreen noted that the knee felt stable, but did elicit pain with stress on the MCL. Dr. Philgreen diagnosed her with left MCL strain, diabetes and hyperlipidemia. He gave plaintiff prescriptions for an Ace knee immobilizer, Vicodin, and Metformin. (Tr. 377).

On December 31, 2007, plaintiff returned to Dickson-Diveley for follow up on her shoulders with Dr. Jones. Snyder reported constant discomfort and about fifty episodes of pain each day. She further reported increased pain with driving and at night. Dr. Jones gave her permanent restrictions of no repetitive lifting, pushing or pulling with either arm, no lifting above the chest with either arm, and maximum lifting of twenty pounds (Tr. 397).

28

On March 29, 2008, plaintiff reported to Exam Pro for a consultative examination by Elizabeth Willis, M.D. Plaintiff reported that she was unable to work due to her shoulders, diabetes and back problems. She reported constant pain in her shoulder, neck and back since 2006 (Tr. 429). She stated that she was diagnosed with spondylosis and sciatic nerve injury. Plaintiff told Dr. Willis that her pain had progressively increased since she slipped and fell at work in January 2007 (Tr. 429). She further noted great difficulty with working at a computer and writing despite physical therapy which did not improve the pain. She reported returning to work in July 2007 following her surgery in May 2007, but she reinjured her left shoulder. Plaintiff continued to have pain in the left and right shoulders, which was worse at night and gave her difficulty with reaching, showering and putting on pants (Tr. 430). She reported that her son did most of the housework. Plaintiff stated that she could sit for two hours at a time but then had trouble getting up. Plaintiff could not stand or walk very long (Tr. 430).

On examination Dr. Willis noted plaintiff stood 5'4" and weighed 245 pounds (Tr. 430). Plaintiff was moderately obese, got on and off the exam table without difficulty, but had decreased range of motion in both shoulders (Tr. 431). She further exhibited poor functional range of motion in her elbows, wrists, knees, ankles, and hips bilaterally. Dr. Willis reviewed medical

29

records from Concentra, the MRI of her left shoulder from September 2007, and the records from Dickson-Diveley Midwest Orthopedic Clinic. Dr. Willis diagnosed plaintiff with diabetes mellitus, hyperlipidemia, and bilateral rotator cuff tear (Tr. 431).

Dr. Willis noted that plaintiff gave her best effort during the examination (Tr. 431). The doctor indicated that multiple records documented bilateral rotator cuff tear which left her with decreased stability and limitations in her shoulders. Dr. Willis stated that if plaintiff were able to get a job she would need to be restricted to no repetitive lifting, pushing or pulling with her bilateral upper extremities and no heavy lifting of upper chest (Tr. 432). Otherwise, plaintiff would be able to sit for up to two hours at a time and walk for thirty minutes at a time. Further, her lifting and carrying should be limited to ten pounds on an infrequent basis (Tr. 432).

On April 9, 2008, Kim Yocom, a Disability Determination Services (DDS) non-medical Single Decision Maker (SDM) completed a Physical Residual Functional Capacity Assessment (PRFC) opining that plaintiff could lift ten pounds frequently, twenty occasionally; and stand for six hours and sit for six hours throughout the day. She further opined that plaintiff's ability to push and/or pull was limited in her upper extremities and she should only occasionally climb ramps/stairs, balance, stoop,

kneel, crouch, and crawl. Yocom went on to opine that plaintiff's ability to reach in all directions was limited and she should avoid all exposure to extreme cold, extreme heat, and vibration (Tr. 222-27).

On April 25, 2008, plaintiff saw a medical provider at Swope Health Services (Tr. at 489). She reported neck and shoulder pain, a cough, nausea, and headaches (Tr. at 489). Her examiner diagnosed bronchitis, arthritis, and other conditions, and prescribed an inhaler along with other medications (Tr. at 489).

On October 9, 2008, plaintiff saw S. Dashiell, M.D., at Goppert (Tr. at 486). Plaintiff complained of nausea, dizziness, fatigue, and left ear pain (Tr. at 485). She also requested refills of her pain medication (Tr. at 485). Plaintiff explained that she had no insurance (Tr. at 485). Dr. Dashiell diagnosed poorly controlled diabetes, hypertension, and chronic shoulder pain (Tr. at 486). Dr. Dashiell strongly encouraged plaintiff to establish care at Kansas City Free Clinic or the Truman Medical Center, as all of her symptoms likely related to poorly controlled chronic conditions (Tr. at 486).

On March 16, 2009, plaintiff saw Pamela Manners, R.N., at the Truman Medical Center Emergency Department (Tr. at 535). Plaintiff complained of a cough and body aches (Tr. at 535). She was diagnosed with bronchitis and received a steroid (Tr. at 540, 541, 542).

On June 1, 2009, plaintiff saw Stephanie Walton, R.N., at the Truman Medical Center Emergency Department (Tr. at 523). She complained of a perineal cyst (Tr. at 523). She was diagnosed with an abscess, and received antibiotics (Tr. at 529, 530).

On June 3, 2009, plaintiff went to Lauren Lord, R.N., at the Truman Medical Center Emergency Department (Tr. at 514). Ms. Lord checked Plaintiff's abscess (Tr. at 514).

On September 24, 2009, plaintiff saw Heather Reslet, M.D., at the Truman Medical Center ("Truman") for a follow-up regarding vulvar eczema (Tr. at 546). She also requested pain medication (Tr. at 546).

On October 24, 2009, plaintiff went to Matthew Strasser, M.D., at the Truman Medical Center to report vaginal bleeding (Tr. at 503). She also told Dr. Strasser that she did not check her blood sugar regularly (Tr. at 504). Dr. Strasser referred Plaintiff to a gynecologist, and advised her to check her blood sugar regularly (Tr. at 504).

On November 4, 2009, plaintiff saw Gerald Finke, D.O., at the Truman Medical Center for a pelvic ultrasound (Tr. at 501). The ultrasound showed no acute abnormalities (Tr. at 502).

On November 12, 2009, plaintiff saw a provider at the Truman Medical Center for another followup visit regarding vulvar eczema (Tr. at 507). Plaintiff reported improvement, and received medication refills (Tr. at 507-08).

On November 23, 2009, plaintiff saw Esmat Sadeddin, M.D., at the Truman Medical Center for a colonoscopy (Tr. at 497). The colonoscopy revealed polyps (Tr. at 499).

On November 30, 2009, plaintiff went to Michelle Walton, R.N., at the Truman Medical Center Emergency Department (Tr. at 493). She complained of right upper quadrant pain, but "left without being seen by practitioner" (Tr. at 493, 496).

On December 1, 2009, plaintiff went to Kimberly Vogel, N.P., at the Truman Medical Center (Tr. 492). Plaintiff complained of a sharp pain to her right side (Tr. 492). Plaintiff also reported that she had lost her diabetic prescription. Vogel refilled Metformin and Glyburide prescriptions and advised plaintiff to follow up with her primary doctor if other symptoms did not improve (Tr. 492).

## C.   *SUMMARY OF TESTIMONY*

During the February 22, 2010, hearing, plaintiff testified; and Denise Wadell, a vocational expert, testified at the request of the ALJ.

## 1.   **Plaintiff's testimony.**

Plaintiff testified that she was a student in the school of education at the University of Missouri-Kansas City (Tr. 29). Plaintiff testified that at the time of the hearing she was 199 pounds and about 5'4" tall (Tr. 29).

Plaintiff testified that since her accident on January 29,

2007, she had been unable to work eight hours a day or five days a week on a sustained basis (Tr. 30). Plaintiff acknowledged that she was able to work two or three days a week most of the time (Tr. 30-31).

Plaintiff testified that she used to work as a house parent in a home for teen mothers (Tr. 34). Her duties at that job consisted of caring for the mothers and babies, cleaning the home, cooking, and security (Tr. 34-35). Plaintiff testified that she would work 8-hour shifts (Tr. 50). Plaintiff said that during the 8-hour shift, she was able to sit for about 15-20 minutes every hour (Tr. 50-51). Plaintiff testified that she left that job because she was going to have to switch to a different shift where she would not be able to bring her son with her (Tr. 51-52). Plaintiff testified that she would not be able to return to that job because she was not able to mop floors or do much cooking because of pain (Tr. 35).

Plaintiff testified that she suffered from shoulder pain to the point that she was unable to sleep at night (Tr. 35). Plaintiff testified that she injured her shoulders when she slipped on ice at work (Tr. 36). Due to the injuries, plaintiff underwent two shoulder surgeries — one on her right shoulder and one on her left (Tr. 36). Plaintiff testified that she also had physical therapy sessions until December of 2007 (Tr. 57). Plaintiff testified that the surgeries initially helped her

34

shoulders, but then the pain got worse again (Tr. 36). Plaintiff testified that she had not seen a doctor for her shoulders since 2008 (Tr. 58).

Plaintiff testified that she filed a Workers' Compensation claim with regards to her shoulder injury and that she settled the claim for $20,000 (Tr. 57).

Plaintiff testified that she could not use her arms up high except for once in a while (Tr. 36) and that she was occasionally able to lift ten pounds (Tr. 37). Plaintiff testified that she had trouble writing for more than three to five minutes and often had to take breaks (Tr. 37-38).

Plaintiff testified that she was taking a full course load in school, but then had to withdraw from some classes because she was in too much pain to have two classes in a row (Tr. 38). Plaintiff testified that she would not be able to graduate on time (Tr. 38).

Plaintiff testified that she takes Ultran and Tylenol for pain (Tr. 39). She said that she used to take stronger pain medication like Vicodin or Hydrocodone, but that it made it sick to her stomach (Tr. 39). Plaintiff said that the pain medication did not help (Tr. 39).

Plaintiff testified that she also suffered form low back pain with shooting pain down her legs (Tr. 40). Plaintiff testified that the pain in her back was not that bad sometimes

and terrible at others, but that she did have pain every night
(Tr. 40). Plaintiff testified that her back pain hindered her
ability to walk and climb stairs (Tr. 40) and that her leg and
hip hurt when walking and climbing stairs as well (Tr. 58).
Plaintiff testified that she believed she could walk a block at
most (Tr. 40). Plaintiff said her back problems began in
approximately 1989-1990 (Tr. 41). Plaintiff testified that her
back pain improved during the 1990s, but that in 2000 got worse
again and resulted in her starting to take Ultran (Tr. 41).
Plaintiff testified that she had not seen a doctor for her back
problems since 2007 (Tr. 56).

Plaintiff testified that she had diabetes (Tr. 42). She said
she was diagnosed with diabetes in 2004 (Tr. 52). Plaintiff
testified that she was at times able to control her blood sugars,
but at the time of the hearing, was no longer taking her
medication because she did not have insurance (Tr. 43). Plaintiff
testified that she stopped taking her medication in 2007 when she
had surgery (Tr. 54). Plaintiff said she was trying to lose
weight so she wouldn't need to take medication for diabetes (Tr.
53-54).

Plaintiff testified that she also suffered from problems
with her neck (Tr. 43). The pain in her neck made it difficult
for plaintiff to sleep and watch TV or movies (Tr. 43-44).

Plaintiff testified that, at most, she slept about two hours

a night (Tr. 44). Plaintiff said she also slept during the day for about two hours at a time (Tr. 44).

Plaintiff testified that she was taking twelve credit hours at UMKC but had to drop to just seven hours (Tr. 60). Plaintiff testified that she was missing classes at school because she was in pain (Tr. 44-45). Plaintiff testified that she had problems sitting in class for more than an hour and that she was unable to do everything that she was supposed to in her practicum course with second-grade children (Tr. 45).

Plaintiff testified that she was unable to do many chores at home including dusting, vacuuming, and washing dishes (Tr. 46). Plaintiff acknowledged that she was able to put some dishes away and to clean surfaces (Tr. 46). Plaintiff said that while she was unable to take laundry out of the washer, she was able to take it out of the dryer in small loads (Tr. 46). Additionally, plaintiff testified that she was able to cook simple foods like soup (Tr. 47).

Plaintiff testified that she did very little driving — mostly between her home and school (Tr. 47). Plaintiff testified that she liveed with her son — 16 years old at the time of the hearing — who did most of the chores, cooking, and driving for her (Tr. 46-47).

Plaintiff testified that she started working at Stone Manufacturing in 2005 (Tr. 64). Plaintiff testified that at the

time she was injured, she worked at Stone Manufacturing as a machine operator (Tr. 63). Plaintiff said that when she got hurt, Stone Manufacturing put her into assembly work — which was lighter than her previous work — where she was bagging O-rings and assembling kits for veterinarians (Tr. 63).

## 2. **Vocational expert testimony**.

Vocational expert Denise Wadell testified at the request of the Administrative Law Judge.

The vocational expert testified that plaintiff's previous work as a house parent would be classified as an exertional level medium, SVP 3, semiskilled job, while the machine operator position would also be classified as an exertional level medium, SVP 3, semiskilled job (Tr. 69).

The ALJ's hypothetical was for a woman between 51 and 54 years of age with three years of college education who can do the full range of light work with the following exceptions: because of the shoulders, there can be no repetitive overhead lifting or reaching with either arm; because of the back problems and weight, she can only occasionally bend but never crawl, kneel, crouch or squat; because of her neck problems, there can be no repetitive movement of the neck; there can also not be any repetitive pushing or pulling within the weight limitations of the light RFC and no lifting from floor level (Tr 69-70).

The vocational expert testified that based on the ALJ's

38

hypothetical for light extertional level work, the plaintiff would not be able to return to either of her previous jobs because her past work had been at the medium exertional level (Tr. 70).

Based on this hypothetical, the vocational expert testified that there is work at the light exertional level, that is unskilled with SVPs of 2 (Tr. 70). The vocational expert testified that examples of jobs included an electrical assembler, DOT 729684054, with 2,400 jobs regionally, and 55,000 jobs nationally (Tr. 70); a connector assembler, DOT 706687030, with 1,200 jobs regionally, and 59,400 jobs nationally (Tr. 71); and a small parts assembler, DOT 706684022, with 2,500 jobs regionally, and 125,000 jobs nationally (Tr. 71).

The ALJ then modified the hypothetical by adding a sit/stand option, where the woman would sit for an hour and then stand for 30 minutes throughout the 8-hour day (Tr. 71). The vocational expert testified that all three of the jobs could still be performed but the numbers of available jobs would drop by 20 percent (Tr. 71-72).

The vocational expert testified that when modifying the hypothetical to add an additional restriction of no lifting above the chest, that the small parts assembler job would no longer be available (Tr. 73). The vocational expert testified that when adding still another restriction of only occasional bilateral

Case 4:11-cv-00631-REL   Document 13   Filed 09/25/12   Page 39 of 50

reaching, all of the jobs would be eliminated (Tr. 74).

**3.   Third party letter.**

On February 16, 2010, Valerie G. Tucker Blackwell, Ph.D., a teaching professor in the school of education at the University of Missouri-Kansas City, wrote a letter to the ALJ regarding plaintiff's school activity. Dr. Blackwell stated that she advised and worked with plaintiff regularly (Tr. 244). She noted that plaintiff's grades had been relatively good, but would have been better if her attendance were regular (Tr. 244). Dr. Blackwell also stated that plaintiff appeared to have difficulty focusing and was unable to stay for entire classes (Tr. 244). Dr. Blackwell said that while plaintiff was a very determined individual, that she struggled with deadlines and requested more time on assignments (Tr. 244).

### V. FINDINGS OF THE ALJ

Administrative Law Judge William G. Horne entered his opinion on April 5, 2010 (Tr. 11-20). The ALJ found that plaintiff was "not disabled" within the meaning of the Act. Specifically, the ALJ found that:

1.   Plaintiff met the special earnings requirement of the Act on the alleged onset date of January 29, 2007, and continued to meet the requirements through the date of the decision (Tr. 19);

2.   Plaintiff had not engaged in substantial gainful

activity since the alleged onset date of January 29, 2007 (Tr. 19);

3. Plaintiff had the following severe impairments: non-insulin-dependent type II diabetes mellitus; obesity, with weight of 199 pounds and height of 5 feet 4 inches; degenerative disc disease of the cervical spine; and degenerative joint disease of the bilateral shoulders, status post left shoulder arthroscopic surgery and rotator cuff repair in May 2007 and right shoulder arthroscopic surgery and decompressive acromioplasty in September 2007 (Tr. 19);

4. Plaintiff did not have impairments, considered singularly or in combination, which meet or equal any of the listed impairments (Tr. 19);

5. Plaintiff's testimony, as to the severity of her overall medical condition and inability to work at any gainful employment secondary thereto, was found not credible or supported by the totality of the evidence (Tr. 19);

6. The third party letter marked as Exhibit 12E was considered and found not to be controlling as to the issue of disability (Tr. 19);

7. Plaintiff, secondary to her medical impairments, including her obesity, had the residual functional

Case 4:11-cv-00631-REL   Document 13   Filed 09/25/12   Page 41 of 50

capacity to do light work; due to her bilateral shoulder condition, plaintiff should not perform any work involving any repetitive overhead lifting or reaching with the upper extremities; due to her back complaints, plaintiff should only occasionally bend and should never crawl/kneel/crouch/squat; Plaintiff should have no repetitive movement of the neck, no repetitive pushing or pulling, and no lifting from floor level (Tr. 20);

8.  Plaintiff was unable to perform any of her past relevant medium work (Tr. 20);

9.  Plaintiff had no transferability of skills (Tr. 20);

10. Plaintiff was born on November 23, 1955, and ranged between 51 and 54 years of age during the period in question, which, under the regulations, is classified as a person "closely approaching advanced age" (Tr. 20);

11. Plaintiff had a "high school" education and about three (3) years of college (Tr. 20);

12. Considering plaintiff's age, education, work experience and residual functional capacity, plaintiff could perform other jobs found in significant numbers in the regional and national economies at the light, unskilled levels, according to the vocational expert; such jobs

42

including electronics assembler and small parts
assembler (Tr. 20); and

13. Plaintiff had not been disabled since January 29, 2007
(Tr. 20).

As to Dr. Willis' opinion, the ALJ acknowledged that it was
given little weight because her findings were based on a one-time
physical examination and were not consistent with the medical
evidence as a whole (Tr. 16).

### VI. OPINION OF NON-MEDICAL STATE AGENCY SINGLE DECISION MAKER

Plaintiff first argues that the ALJ erred by assigning
weight to the opinion of the non-medical State Agency single
decision maker. In support of her argument, plaintiff cites
Dewey v. Astrue, 509 F.3d 447 (8th Cir. 2007), a case in which
the Eighth Circuit remanded a case where the ALJ evaluated the
opinion of a single decision maker as a medical expert. Plaintiff
also cites Chief ALJ Frank A. Cristaudo's May 19, 2010 Memorandum
to Regional Chief ALJs that stated ALJs were to "evaluate [single
decision maker] RFC assessments as adjudicatory documents only,
and not accord them any evidentiary weight when deciding cases at
the hearing level."

In this case, the ALJ stated:

The undersigned has therefore considered the assessment
of the non-examining State agency medical consultant,
with respect to claimant's physical capacity (Exhibit
7E), and has given it weight in reaching the
conclusions that claimant is not disabled, because it
is generally consistent with and supported by the

43

> findings, opinions, and conclusions of treating and
> medical sources contained in the record.

(Tr. 19). Defendant agrees that opinions from single decision-makers are not entitled to weight, but argues that the ALJ's error was harmless in this case. I agree.

An important distinction exists between the factual circumstances warranting remand in Dewey and the facts of the instant case. Specifically, the Eighth Circuit remanded Dewey for a rehearing where Dewey's treating physician's opinion was more restrictive than that of the single decision maker. The Eighth Circuit reasoned, "in light of the presence in the record of a more restrictive opinion from Dewey's treating physician, we cannot say that the ALJ would inevitably have reached the same result if he had understood that the Residual Functional Capacity Assessment had not been completed by a physician or other qualified medical consultant." 509 F.3d at 450-51.

The opposite is true in this case; that is, the medical opinions of record (i.e., Drs. Willis and Jones) are less restrictive than that of the single decision maker. The single decision maker opined that plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about eight hours in an eight-hour workday; perform limited pushing and/or pulling in the upper extremities; occasionally climb, stoop, kneel, crouch and crawl; never

44

balance; limited reaching; unlimited handling, fingering and feeling (Tr. 223-27). By contrast, Dr. Jones gave Plaintiff permanent restrictions of no repetitive lifting, pushing or pulling with either upper extremity, no lifting above the chest with either upper extremity, and maximum lifting of twenty pounds to the chest (Tr. 397). Dr. Willis opined Plaintiff was not limited in squatting, stooping, bending, or crouching (Tr. 432). Accordingly, to the extent that the ALJ's residual functional capacity was influenced by the single decision maker, the influence resulted in more restrictions making any error harmless. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004). Plaintiff's motion for summary judgment is thus denied on this basis.

### VII. WEIGHT TO MEDICAL OPINIONS

Plaintiff next contends that the case should be remanded due to uncertainty as to how the ALJ weighed the medical opinions. Plaintiff argues the ALJ failed to articulate what weight he assigned to Dr. Jones' opinion and did not give "proper credit to the opinion of Dr. Willis."

The regulations address the manner in which the ALJ should consider medical opinions. 20 C.F.R. §§ 404.1527 and 416.927; Social Security Ruling (SSR) 96-2p. Under these regulations, opinions issued by treating physicians will generally receive more weight than opinions issued by consultative examiners. 20

45

C.F.R. §§ 404.1527(d)(1)-(2) and 416.927(d)(1)-(2). However, consultative opinions are usually entitled to more weight than the opinions of physicians who never examined the claimant. Id. When opinions in the record conflict, it is the ALJ's role to resolve the discrepancies. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006). An ALJ may assign a medical opinion reduced weight when, as in this case, it conflicts with other evidence in the record. Davidson v. Astrue, 501 F.3d 987, 991 (8th Cir. 2007).

I note initially that the ALJ's failure to specifically articulate the amount of weight given to Dr. Jones' opinions is not dispositive. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010)("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)(finding ALJ gave some credit to physician's medical opinions based on limitations in the RFC assessment); Kresyman v. Astrue, No. 09-00507-CV-W-NKL, 2010 WL 670248 at *5 (W.D. Mo. Feb. 22, 2010)(rejecting claimant's argument that the ALJ must explicitly state the weight given to each medical opinion and finding that the ALJ's detailed examination of the medical record made clear the weight afforded to the medical opinions).

The ALJ's reliance on Dr. Jones' opinions is demonstrated both by his discussion of Dr. Jones' records and by his reference

46

to Dr. Jones' opinions when discrediting those of Dr. Willis. Although the ALJ does not articulate a specific weight given to Dr. Jones' opinions, similarities are evident between Dr. Jones' restrictions and the RFC. Dr. Jones gave plaintiff permanent restrictions of no repetitive lifting, pushing or pulling with either upper extremity, no lifting above the chest with either upper extremity, and maximum lifting of twenty pounds to the chest (Tr. 397). The ALJ similarly found plaintiff retained the following residual functional capacity:

> She is limited to light work as that work is defined in the regulations. Because of her bilateral shoulder condition, claimant should not perform work involving any repetitive overhead lifting or reaching with the upper extremities, bilaterally. Because of her back complaints and obesity, claimant should only occasionally bend and should never crawl, kneel, crouch or squat. There should also be no repetitive movement of the neck or repetitive pushing or pulling within the confines of a light residual functional capacity, and no lifting form floor level.

(Tr. 20).

Additionally, the ALJ did not err in affording less weight to Dr. Willis' opinions. Dr. Willis merely performed a consultative examination and his restrictions were inconsistent with plaintiff's sporadic treatment for orthopedic complaints. By contrast, Dr. Jones was plaintiff's treating physician and in a better position to assess Plaintiff's restrictions. He had examined plaintiff thirteen times over the course of nine months, and performed surgery on both of Plaintiff's shoulders. I,

47

therefore, find that substantial evidence supports the weight given to medical opinions.

## VIII. RESIDUAL FUNCTIONING CAPACITY DETERMINATION

Lastly, Plaintiff argues that the ALJ erred to derive a proper RFC because he did not describe a maximum amount for each of plaintiff's activities. See Pl.'s Br. at 19. Defendant responds by arguing that the ALJ properly derived plaintiff's RFC from relevant evidence and a complete hypothetical posed to a Vocational Expert (VE). See Def.'s Br. at 22.

According to SSR 96-8p, when formulating an RFC, the ALJ must (1) include a narrative discussion of how the evidence supports each conclusion and cite specific medical facts and non-medical evidence; (2) assess the individual's ability to perform sustained work activities in a work setting on a regular and continuing basis; and (3) describe the maximum amount of each activity the person can perform. SSR 96-8p. An ALJ can meet this burden by questioning a vocational expert about a hypothetical claimant with plaintiff's limitations. Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007). The ALJ's hypothetical questions to a vocational expert are complete when they convey all of the limitations the ALJ found credible. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004).

Plaintiff argues that an ALJ must specifically set a maximum for a claimant's limitations and cites to Pfitzner v. Apfel, 169

48

F.3d 566, (8th Cir. 1999), as justification for remand here. See Pl.'s Br. at 23-24. In Pfitzner, the ALJ made no specific findings as to the claimant's RFC but merely stated that the claimant "retained the residual functional capacity to return to his past relevant work." 169 F.3d at 568. The court held that when an ALJ finds that a claimant can return to his past work, the ALJ is further required to "make explicit findings regarding the actual physical and mental demands of the claimant's past work." Id. However, an "ALJ may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the claimant's past work." Id.

Here, Plaintiff argues while the ALJ's posed hypothetical made reference to "light work as that is defined in the regulations," the regulations referenced to do not address a claimant's capability for sitting and standing. However, in the ALJ's findings of plaintiff's RFC, he did not find that she had any limitations as to sitting or standing. While sitting and walking were addressed by Dr. Willis's opinion, as discussed above, the ALJ was not bound by the opinions of any doctors, and it is thus appropriate for him not to have found an impairment relating to plaintiff's ability to sit and/or stand. Even if he would have found an impairment with regard to plaintiff's sitting and standing, one of the hypotheticals addressed at the hearing

49

accounted for a sit/stand option and the vocational expert testified that jobs would still be available. In addition to the ALJ's specific findings as to plaintiff's RFC, he also made reference to the jobs for which plaintiff would be qualified and included references to Dictionary of Occupational Titles numbers associated with each. Plaintiff's motion for summary judgment is denied on this ground.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 24, 2012

50